**J.M. INWEST Sp. z o.o.**
04-536 Warszawa, ul. Bychowska 57
tel. 022 455-85-05, fax: 022 455-85-07
REGON 140352182 NIP 527-24-90-050

Warsaw, 14 July 2015

United States Bancruptcy Court
Southern District of New York
300 Quarropass Street
Room 248
White Plains, NY 10601

Case No. 13-22748-RDD

### Reply to the Statement of Claim

Having been served the statement of claim in this case, we apply for dismissing the claim in full and enclose herewith the reply to the statement of claim together with evidence marked as Exhibit A to Exhibit Y.

PREZES
*Jerzy Mendelka*

mgr Marek Kozielski
Tłumacz przysięgły języka angielskiego
Sworn translator of English
01-052 Warszawa, ul. Anielewicza 24 m 42
Tel./fax: (022) 888-25-95/96
Mobile: (+48) 603 742 411
email: aureadicta@acn.waw.pl

*Certified translation from the Polish language:*-----

Warsaw, 30 June 2015

## Reply to the statement of claim

### I Introduction

1. On 22 June 2015, the statement of claim of the Bankruptcy Trustee in relation to bankruptcy case No. 13-22748-RDD, filed against Jerzy Mendelka and his related companies, was served at the registered office of J.M. Inwest Sp. z o.o. in Warsaw at ul. Grzybowska 45, via the District Court for Warsaw Wola in Warsaw.

2. Reading the statement of claim leaves no doubts that it requires firm response by Jerzy Mendelka and the Companies he represents.

3. The statement of claim served is legalese gobbledygook, creating a false picture of truth, omitting key facts and pieces of evidence in the case.

4. The statement of claim presents a false picture of the case in the light of which Jerzy Mendelka and the entities he represents were not injured by the actions of Roman Śledziejowski, but at least participated with him in the criminal businesses.

5. Not only is such the presentation of the case by the Trustee far from reality and proves the trustee's poor knowledge of the facts, but it also constitutes an unauthorised manipulation of the facts and evidence gathered in the case.

6. The trustee's shocking behaviour has features of willfulness aimed at acting to the detriment of Jerzy Mendelka and the Companies he represents. It is not possible to view otherwise the situation where the trustee, Ms Marianne T. Otole, having received on 28 August 2013 from the attorney Elżebieta Kurkowski, Jerzy Mendelka's response to the reply to the statement of claim of Roman Śledziejowski's attorneys, with a number of documents enclosed which are evidence of the following:
    a) the legal relation which constituted grounds for TWS transferring funds to JM INWEST (appendix G – lease contract regarding office space concluded between TWS and JM INWEST on 20 February 2009);
    b) the manner of settlements between the parties in respect of the lease contract (appendix H – mutual settlements agreement relating to the lease contract dated 20 February 2009);
    c) Roman Śledziejowski's acknowledgement of his debt towards Jerzy Mendelka (appendix F – agreement prior to concluding the proper legal deed dated 7 September 2012),



1

d) amounts paid by the Companies owned by Jerzy Mendelka to the account of NDV at PENSON, which were freely, without any authorisation, withdrawn and embezzled by Roman Śledziejowski (appendix A – list of payments).

completely omitted the evidence supplied, as if the evidence had never been produced to the trustee, although she confirmed the receipt of the same.

7. The only reasonable explanation for the existing situation is the intentional action of the trustee, who deliberately omitted the evidence which was favourable for Jerzy Mendelka and the entities he represents.

8. The trustee does not consider the defence's evidence, aiming at shifting the liability for the illegal activities of Roman Śledziejowski, who sent allegedly false transfers, to the injured person who received payments from various sources, having no influence on where the transfer were made from, moreover as TWS, being bound by an agreement with JM Inwest, had a right to send transfers via third parties.

9. **Jerzy Mendelka has never carried on and does not carry on any activities in the United States, while entities represented by him only had a bank account there. It is not known what constitutes the basis for the Trustee's information and belief in this regard, but surely they are not based on the truth, but at the most on her fabrications and insinuations. The same refers to Adam Mendelka.**

10. The statement of claim insults the good reputation of Jerzy Mendelka and the Companies he manages, and thus they cannot remain indifferent to the libel presented therein.

11. Reading the statement of claim is in practice incomprehensible and based mostly on groundless and unfounded statements, and first of all, conjectures, referred to as information and beliefs, and furthermore is an example of speculations and manipulation of evidence and facts, as well as it proves, however, that the trustee does not quite understand the complex matters relating to the contacts and business relations between the entities related to Jerzy Mendelka and Roman Śledziejowski.

12. It is necessary to explain the circumstances of the case once again, so that no doubts are left as to the fact that it was Roman Śledziejowski and firms lead by him that are guilty of a number of frauds, while Jerzy Mendelka is one of the most injured persons and a victim of the dealings (the financial pyramid) launched by Śledziejowski.

### I Outline of the history of the facts and circumstances

13. Jerzy Mendelka had known Roman Śledziejowski as long as since 2000.



14. Jerzy Mendelka was introduced to Śledziejowski by Ms Barbara Łukasik who was Jerzy Mendelka's bank account manager at Citibank in Warsaw, and who later became an employee of Śledziejowski.

15. Roman Śledziejowski gained Jerzy Mendelka's trust.

16. Jerzy Mendelka and Roman Śledziejowski maintained close social contacts with each other. Śledziejowski attended Jerzy Mendelka's wedding, his children's baptism and first communion ceremonies, parties relating to opening buildings and offices in Warsaw, anniversaries, as well as he, together with his wife, spent holidays in Krynica Morska at Jerzy Mendelka's pension house.

17. The trust gained caused that Jerzy Mendelka did not object to Roman Śledziejowski intermediating in establishing an offshore company – NDV Investments – for Jerzy Mendelka. Roman Śledziejowski's proposal took place at the beginning of 2008. The Company was formed in March 2008.

**Evidence A: articles of association of NDV Investment**

18. Firstly, the defendants will discredit the trustee's claims as to that any loan agreement was concluded with Innovest Holding which would constitute the source of financing JM Tower.

19. For this purpose, the actual sources of financing the construction of the JM Tower building will be presented.

20. Further, it will be demonstrated that such an agreement was never concluded, and even could not be concluded, as it does not contain the basic parameters of a contract.

21. The scheme of the investment of funds will be presented which was to be carried out by Roman Śledziejowski with the funds paid by the subsidiaries of Jerzy Mendelka.

22. Also the scheme of the fraudulent business, whose victim Jerzy Mendelka was, will be outlined.

23. Evidence will be presented that Roman Śledziejowski acknowledged his debt towards Jerzy Mendelka and his subsidiaries.

## II Sources of financing the construction of the JM Tower building

### A Loan agreement with RYNA CAPITAL



3

24. In 2006, for the purpose of tax optimisation Jerzy Mendelka had established another offshore company – RYNA CAPITAL with its registered office in Panama.

**Evidence B: articles of association of RYNA CAPITAL**

25. On 18 December 2006 loan agreement No. 21/PL/2006 was signed under which RYNA CAPITAL lent J.M. Inwest Sp. z o.o. USD 30,000,000 designated for construction of JM Tower building (§1 point 3 of the agreement), (both Companies were controlled by Jerzy Mendelka)

**Evidence C: loan agreement No. 21/PL/2006**

26. The loan was drawn down in tranches.
    **Evidence D (D1-D23)**, comprising the list of bank transfers and 23 bank statements confirming the transfer of the funds from RYNA CAPITAL to JM Inwest.

27. The repayment of the loan was secured by security deposits made in favour of RYNA CAPITAL:

a) in the amount of USD 33,000,000 under the security deposit agreement dated 18 December 2006 with J.M. Property Sp. z o.o. Sp.k., (a partnership controlled by Jerzy Mendelka) and

b) in the amount of USD 3,300,000 under the security deposit agreement dated 9 February 2007 with Jerzy Mendelka (personal account)

**Evidence E (E1-E2): security deposit agreements**

### B Bank loans

28. Another source of financing the construction of JM Tower were bank loans, including:

a) from PKO BP S.A for the amount of PLN 33,500,000

**Evidence F – bank loan agreement dated 11 May 2010**



b) from Noble Bank S.A. taken on 24 June 2009 for the amount of PLN 12,474,451.14

**Evidence G1** – opinion on the bank loan, **Evidence No. G2**: agreement for investment loan taken from PKO BP S.A. in order to repay the loan from Noble Bank (unfortunately the defendant does not have in his disposal the agreement regarding the loan from Noble Bank, but from the indirect evidence produced it appears that such a loan was undoubtedly taken.

### C Summary

29. The total sum of the amounts for the construction of JM TOWER obtained from the loan from RYNA CAPITAL is: USD 24,499,384.09 x PLN 3 (US exchange rate) which gives the amount of PLN 73,498,152.27. The amount of PLN 33,500,000 of the bank loan from PKO BP, and the amount of PLN 12,474,451.14 of the bank loan from Noble Bank, refinanced by Bank PKO BP on 29 January 2010 under loan agreement No. 03 1020 3378 0000 1796 0028 5252 should be added to the said amount, which gives the total amount of PLN 119,472,603.41.

30. The said amount of PLN 119,472,603.41 was sufficient for the construction of the JM Tower building, which is also documented by the balance sheet of J.M. Inwest Sp. z o.o. for 2012 from which it appears that the JM Tower building cost PLN 87,466,087.65 (item AII1b in the balance sheet).

**Evidence H: balance sheet for 2012**

31. JM Inwest possessed funds to construct the JM Tower building, and it also had free funds which could be designated for investment purposes. An example may be the fact that shortly after the loan was granted by Noble Bank on 24 June 2009, Jerzy Mendelka transferred from the account of JM Property to the account of NDV at PENSON the amount of USD 3,000,000 which was designated for increasing the amount securing the loan for purchasing the bonds of Morgan Stanley, which enabled to increase the amount of the loan extended. The amount of USD 3,000,000 was transferred at the request of Roman Śledziejowski in order to increase the amount securing the loan for purchasing the bonds of

Morgan Stanley. As it was found out, the amounts deposited before, were no longer on the accounts at PENSON at that time.

**Evidence I: transfer confirmation**

### III Lease contract with TWS Financial

32. On 20 February 2009, J.M. Inwest Sp. z o.o. concluded with TWS Financial a contract for lease of office space in the JM Tower building, which was completely omitted by the trustee from her statement of claim.

**Evidence J: lease contract**

33. The validity of the contract, apart from the signature of Roman Śledziejowski, is also emphasised by the official stamp of TWS Financial LLC and the fact that the pages are initialled. The note in the description of the transfers, on the other hand, relates to loan agreement No. 21/PL/2006, whereas the payment was made in respect of the lease contract dated 20 February 2009 and the agreement regarding settlements of the same date. There is no reference, however, to a loan agreement with Innovest Holdings allegedly concluded on 14 April 2009.
34. No one challenged the validity of the lease contract dated 20 February 2009, but due to the fact that the contract was concluded under Polish law, it is not the trustee but only a Polish common court that would be competent to decide on the validity of the contract (§17 of the contract).
35. On the same date as the lease contract, J.M. Inwest Sp. z o.o. and TWS Financial concluded a mutual settlements agreement relating to the lease contract dated 20 February 2009.
36. The agreement related to the manner of settlements and the companies which were to settle Śledziejowski's liabilities (the contents of the contract and the agreement were drawn by Roman Śledziejowski in Polish, as Jerzy Mendelka speaks no English)

**Evidence K: agreement**

36. Pursuant to §2 of the agreement, TWS undertook to transfer the amounts under the lease contract on a monthly basis via RYNA CAPITAL to the account of JM INWEST in relation to loan agreement No. 21/PL/2006.

37. The monthly rent installments were paid, on behalf of TWS, from the bank account of Innovest, which was allowed and resulted from the contents of the contract, as third parties could pay for TWS to the bank account of Ryna Capital or NDV Investments, §3 point 2 of the contract, or directly to the account of JM Inwest.

**Evidence L: list of transfers made from the bank account of Innovest to the bank account of J.M. Inwest sp. z o.o. in the period from 13 March 2009 to July 2012.**

38. The payments were made to JM Inwest via RYNA Capital in relation to loan agreement No. 21/PL/2006 dated 18 December 2006.

**Evidence M1 – M41: bank confirmation of transfers (with transfer description "in relation to agreement No. 21/PL.2006")**

39. The trustee enclosed to the statement of claim the lists of transfers, which according to the trustee were made illegally.
40. The tables presented by the trustee constitute an unlawful attempt at manipulating the facts and they are not reflected in reality.
41. All the transfers from Innovest, which were attached to the statement of claim, constituted the fulfillment of TWS obligation under the lease contract and the agreement dated 20 February 2009 in relation to agreement No. 18 December 2006.
42. Contrary to the tables presented by the trustee in the statement of claim, Jerzy Mendelka has also in his disposal the lists of transfers made from the account of Innovest in favour of JM Inwest.
43. Jerzy Mendelka has also in his disposal bank statements (Evidence M1 – M41), containing explicit transfer description specifying the grounds for the payment made. It can be clearly seen that the payments were made in respect of agreement No. 21/PL/2006, namely the loan agreement concluded between Ryna Capital and JM Inwest on 18 December 2006 (Evidence C). Furthermore, from §2 of the agreement dated 20 February 2009 (Evidence K) regarding mutual settlements relating to the lease contract dated 20 February 2009 concluded between TWS and JM Inwest it appears that TWS undertook to transfer the amounts under the lease contract on a monthly basis to the account of JM Inwest <u>in relation to loan agreement No. 21/PL/2006 dated 18 December 2006</u>.

7

44. The payments made by Innovest (TWS) reflected the provisions of the contract and the agreement dated 20 February 2009.

45. There are no grounds for the Trustee's claims that the transfers had been illegal, as legal grounds existed for making the payments to J.M. Inwest.

46. Referring to the defendants as to payees of illegal transfers, where such a wording appears a few dozen times in the statement of claim, **constitutes mere libel deserving a separate law suit.**

47. It was Roman Śledziejowski's initiative to lease the building which had not been commissioned for occupation yet.

48. The construction of the lease contract was such that TWS was to pay the rent of 13$ per m2 of space for the entire term of the contract, which once the building had been commissioned for occupancy would translate into the possibility of sub-leasing the same space for 35 – 40 $ per m2. (**§12 of the contract).**

49. The low rent would be binding for the tenant for the whole term of the contract, also after the contract was automatically prolonged (**§3 of the contract**).

50. Such a construction of the contract is very common in Poland, and in particular in Warsaw were a large number of buildings was constructed offering a high standard of space. The investor profited from the fact that it had a tenant for nearly whole office space before commissioning the building for occupancy and did not have to worry about commercialisation of the office space, while the tenant was to derive profits from subleasing the space leased from the investor at a lower price and subleasing the same for a rate which was even three times higher.

51. Concluding such a contract was in the interest of both parties (§3 points 1 and 2 of the contract and §12 of the contract).

### IV Loan agreement allegedly concluded

### An Introduction

52. Jerzy Mendelka denies that he ever signed on behalf of J.M. Inwest Sp. z o. o. any agreement with Innovest Holdings LLC.

53. In particular Jerzy Mendelka did not sign a loan agreement on 14 April 2009, neither did he sign any bill of exchange regarding such an agreement.

8

54. It is surprising that the trustee regarded it effective and valid although it has no features of an agreement and was fabricated for the needs of defending Roman Śledziejowski from the charges laid against him.

### B Reasoning against regarding the alleged loan agreement effective and valid

55. The attorneys of Roman Śledziejowski produced only a copy of the alleged agreement with no initials on its pages, and they are not even numbered – each page may be freely exchanged. If such an agreement were in fact concluded, they must have in their disposal the original document, as the defendants have no such an original. **The defendants, therefore, demand the bankruptcy trustee to produce the original of the allegedly concluded loan agreement;**

56. Not only is the alleged signature of Jerzy Mendelka placed on a separate sheet, but it is also placed on it by copying the signature from another document scanned before; it appears from other documents attached that, each time when Jerzy Mendelka signs a document on behalf of J.M. Inwest Sp. z o.o., his signature is signed on the stamp [President Jerzy Mendelka] and next to it the company stamp is affixed;

57. Jerzy Mendelka initials pages of agreements he signs.

58. Should Jerzy Mendelka had actually wished to conclude the loan agreement of the contents presented, the agreement would have been surely stamped and made in Polish.

59. There being no stamp refers also to the signature of Roman Śledziejowski which is normally accompanied by stamps of TWS Financial, but in case of this specific document there are no such stamps;

60. No town/city where the agreement was concluded is stated, and from the agreement it does not appear where it could be concluded; Jerzy Mendelka never visited the office of TWS or any other office of Roman Śledziejowski, which may be confirmed even by employees of the office, including e.g. Ms Monika Majdan. The lease contract and the agreement dated 20 February 2009 concluded with TWS were signed in the registered office of JM Inwest in the presence of a witness, Konrad Kujawski.

61. Addresses of the entities allegedly concluding the agreement are missing, and moreover surely the registered office of RYNA Capital is not in Switzerland, which arises from the attached articles of association of the company,

62. It appears from the agreement that the borrower had requested the lender to grant a loan facility, but it is not known when the borrower requested the same and where is any application for granting the loan;

9

63. If in the recitals to the agreement it was stated that Jerzy Mendelka was acting as an authorised representative, why the agreement is not accompanied with a relevant authorisation confirming the power of Jerzy Mendelka to represent the said companies;

65. While in Article 1 it is said that Jerzy Mendelka confirms that he is a debtor of the Lender, if it was actually so, why no such a confirmation is attached to the agreement;

65. Jerzy Mendelka did not apply for loan draw downs. Where is any evidence that Jerzy Mendelka ever applied to the lender for any periodical payment;

66. In Article 1 there is a provision under which the Lender hereby makes a US dollar Loan Facility available to the Borrower <u>for the total amount which will be agreed within the next three years</u> on the basis of terms and conditions of this Agreement. There is no evidence that such arrangements were made, in which circumstances, and thus one cannot refer to the validity of a loan agreement which does not specify the amount of loan or at least indices on the basis of which the amount is to be computed;

67. J.M. Inwest did not need funds for constructing JM Tower, as, which is pointed out above, the construction was financed by funds from the bank loan from PKO No. 41 1020 3378 0000 1296 0039 2670 and loan from RYNA CAPITAL No. 21/PL/2006, and the description of each transfer stated that it was in relation to agreement No. 21/PL/2006;

68. J.M. Inwest did not need funds for constructing JM Tower, and what is more, it had free funds, which is confirmed by the fact of sending on 2 July 2009 to the account of NDV at Penson the amount of USD 3,000,000, and the amount of PLN 4,500,000 on 23 December 2010 and 29 December 2010. A question arises, therefore, as to the logics of actions consisting in that on 14 April 2009 Jerzy Mendelka took a loan for constructing JM TOWER and as early as on 2 July he sent 3 mln $ to the account of NDV.

69. Jerzy Mendelka would have never signed such an agreement as he does not speak English;

70. As the borrower was to specify the entity (payee) and the bank account number for transfer of funds each time, where is evidence that it was actually so;

71. The agreement provides for no way of securing of the alleged loan;

72. The descriptions of the transfers specified that they related to agreement No. 21/PL/2006, which was connected with the lease contract dated 20 February 2009. If this was the repayment of the loan facility, this would be reflected in the bank transfer description (loan under the agreement dated 14 April 2009).

**Evidence N1 – N3 transfer confirmations**

10

73. Just in case, however, for the reason of prudence in proceedings, the defendants point out to the charge of time limitation, as the agreement was allegedly concluded under the laws of the State of Delaware, where the time limitation period for agreements concluded in writing is 3 years (the forged agreement dated 14 April 2009, thus it became time barred on 14 April 2012).

### C Summary

74. In the light of the said reasoning there can be no doubts that the "loan agreement" produced by Śledziejowski constitutes an attempt at manipulating and was crated for the needs of the proceedings pending, and the circumstances of using the signature of Jerzy Mendelka, surely copied from another document, or falsifying the same, should be subject to separate criminal proceedings.

### V Investment in the USA
### A Source of the Investment

75. Out of the amount of USD 33,000,000 paid by J.M. Property Sp. z o.o. Sp.k. to REYNA CAPITAL to secure loan No. 21/PL/2006, the amount of USD 10,000,000 was transferred in order to secure the loan to the account of NDV at Penson Financial.

76. The funds were transferred on 21 May 2008, with a reservation that they would be repaid to the account of RYNA after the completion of the planned investment, namely after 4-6 months.

**Evidence O** – confirmation of transfer + transaction instruction

77. The amount of USD 3,000,000 was sent for the same purpose, to the same account on 2 July 2009 directly from the account of J.M. Property Sp. z o.o. Sp.k.

**Evidence N1** – transfer confirmation

78. On 23 December 2010, the amount of PLN on 23 December 2010, and the amount of PLN 2,500,000 on 29 December 2010

11

**Evidence N2-N3** – transfer confirmations

### B Description of the investment mechanism

79. The amounts referred to in point A were transferred to the account of NDV at PENSON

80. The amounts referred to in point A were intended to secure a loan of up to USD 50,000,000 which TWS was to borrow for NDV for the purpose of purchasing bonds of Morgan Stanley bank and others, bearing interest at 7% per annum.

81. Roman Śledziejowski claimed that TWS brokerage house owned by himself had been instructed by Morgan Stanley bank to buy their own bonds, he also claimed that he had been instructed by the holders of such bonds to sell the same at USD 92 per one bond.

82. The loan itself was to be subject to 2.2% interest per annum and was taken for the period of 3-6 months, namely for the period of buying and selling the bonds of Morgan Stanley.

83. The whole operation of buying the bonds from the market and reselling the same to Morgan Stanley was to take no more than 3 months.

84. The bonds were to be purchased by TWS using the funds of NDV, as a pledge for the loan exceeding twice the amount deposited on the accounts of NDV at Penson.

85. The operation was to be repeated on a number of occasions: for USD 24,000,000, for USD 35,000,000, and twice for USD 50,000,000.

86. Once the bonds had been acquired, Morgan Stanley bank was to approach TWS and, pursuant to the previous proposal, to buy back its own bonds (bearing 7% per annum). Morgan Stanley extended such a proposal as after the economic crisis in the years 2008/2009, the Federal Reserve (FED), granted various financial institutions low-interest loans (approximately 1%) in order to improve their financial situation. At least, it was as Roman Śledziejowski explained this.

**Evidence P: a sample issue prospectus of Morgan Stanley and Roman Śledziejowski's hand-written notes from which the expected rate of return on the investment appears.**

87. The transactions carried out were to bring measurable benefits resulting from the difference between the annual interest on the loan taken for the purchase of the bonds (2.2%) and the interest on the bonds (7%), as well as the possibility of reselling at USD ?

100 per one bond 500,000 bonds which had been purchased at USD 92 per one bond, which gave a net profit of 4,000,000. To this one should also add the bonus on the difference of 4.8% in the interest rate during the entire term of the transaction, furthermore as the transactions were to be effected repeatedly.

### VI Taking out the funds by Śledziejowski

88. The amounts deposited by RYNA CAPITAL and J.M. Property Sp. z o.o. Sp.k. in the account at Penson were never to be traded but were only intended to secure the loan taken by NDV in order to purchase bonds of Morgan Stanley.

89. Jerzy Mendelka maintained close social and business contacts with Roman Śledziejowski, therefore the defendant had no reason not to trust Roman Śledziejowski and to suspect that he would take out funds from his account without his knowledge and consent, furthermore, as pursuant to the agreements concluded Jerzy Mendelka was the only person authorised to dispose of the funds held in the account at PENSON. Furthermore, Jerzy Mendelka trusted institutions of public trust, PENSON being such an institution, supervised by FINRA.

90. Jerzy Mendelka never authorised Roman Śledziejowski or TWS to manage the funds gather on the accounts.

91. Should Jerzy Mendelka wish that TWS would administer his funds, he would have transferred the funds to the account of TWS or of Śledziejowski. The funds were, however, transferred to accounts of companies owned by Jerzy Mendelka at PENSON.

92. Should Roman Śledziejowski have used a relevant authorisation, he must have falsified the signature of Jerzy Mendelka, moreover as PENSON was obliged to verify whether it is in fact the will of the account owner to effect the given transfer of funds. This purpose may be served by relevant verification procedures, e.g. recorded telephone verification procedures, as it is done by Citibank, through asking the client questions e.g. regarding his mother's name, bank accounts held and loans taken, or otherwise, for example through requesting the client to arrive personally at the branch of the financial institution and signing in the presence of an officer upon verification of the passport or another identity document or signing with an electronic signature by providing the login and password.

93. PENSON made no attempt to contact or verify Jerzy Mendelka, although it was Jerzy Mendelka that was the sole person authorised to manage the funds gather in the accounts.

13

at PENSON, which confirms that the funds must have been taken out with participation of an officer of PENSON.

94. Jerzy Mendelka never received any statement confirming payment of funds out of accounts at PENSON.

95. Jerzy Mendelka's first suspicions as to fraudulent intentions of Roman Śledziejowski arose as early as in 2010, which was manifested in serving on Roman Śledziejowski the statement of 2 July 2010. Along with the statement accepted, Roman Śledziejowski declared in the presence of witnesses that he had never held any powers of attorney.

**Evidence R:** statement dated 2 July 2010

### VII Acknowledgement of his debt by Roman Śledziejowski

96. The suspicions soon turned into certainty as to the criminal nature of Roman Śledziejowski's behaviour.

97. Roman Śledziejowski, however, acknowledged his debt towards Jerzy Mendelka and his subsidiaries.

98. On 12 January 2012, a settlement agreement was signed, under which TWS undertook to pay to JM Inwest a compensation of USD 500,000 and PLN 1,300,000.

**Evidence S** – agreement dated 12 January 2012,

99. On 2 March 2012, a settlement was signed, under which TWS undertook to return to NDV USD 1,940,000 and PLN 3,000,000.

**Evidence T** – settlement dated 2 March 2012,

100. Roman Śledziejowski assumed another undertaking concluding an agreement on 7 September 2012. In the agreement, he confirmed that Jerzy Mendelka was the only person authorised to administer the account of NDV, which as at the date of concluding the agreement was worth nearly USD 17,000,000. How, therefore, one can explain the fact that on one hand Roman Śledziejowski and his subsidiaries were to be a lender under the alleged loan agreement, while on the other hand Śledziejowski signs a declaration in which he confirms that he owed NDV a large sum of money.

**Evidence U** – agreement dated 7 September 2012;

101. Roman Śledziejowski's acknowledgment of debt is also confirmed by extensive e-mail correspondence, the authenticity of which has never been questioned.

**Evidence V** – printouts of e-mails from which the receivable appear;

102. The declarations and agreements on acknowledgement of signed by Roman Śledziejowski were aimed at Jerzy Mendelka recovering his debts in court proceedings sooner.
103. All the declarations of Śledziejowski, as well as agreements and settlements concluded with him are evidence that Śledziejowski was not able to return the funds sent by RYNA CAPITAL and J.M. Property
104. In the second half of 2012, during the visit at the registered office of Penson Financial in Dallas, it turned out that the funds from the accounts of NDV and JM Property had been taken out as early as in September 2008.

### VII The business of concealing the fraud

105. Roman Śledziejowski had taken out funds from the accounts at PENSON, attempting, however, to conceal this fact he made appearances that he was investing the defendants' funds via the TWS brokerage house.
106. The dealings were advanced to such an extent that the defendant had a possibility to log in the electronic system which allegedly presented the financial result of the investments.
107. As it turned out, the financial values shown in the printouts from TWS IT system, similarly as the entire system, were fabricated in order to conceal Roman Śledziejowski's frauds and were aimed at putting the defendant's vigilance at sleep and to convince him that his money was safe.
108. The data available on the computer screens, however, were not reflected in any real entries and book records.
109. The evidence that it was just a manipulation may be the printout held by the claimant. The first document entitled "Accounts transactions" allegedly documents the transactions effected for the period from 22 May 2008 to 22 August 2012 at NDV's account No. 38004503. This is directly followed by a printout allegedly documenting transactions

effected in the period from 22 August 2008 to 22 August 2012 on NDV's account 1067034. None of the said documents bears a date when it was made, which only confirms that it could have been freely changed and it is not known that it the date thereof, and Jerzy Mendelka does not know how it has made its way to the trustee's files.

110. Although the third document, entitled "Account snapshot" contains a date it was made, but as compared to the remaining two printouts it does not constitute a reliable document. Jerzy Mendelka has in its disposal a number of such documents which are the evidence of Roman Śledziejowski's embezzlement, as the funds allegedly earned by Jerzy Mendelka according to those printouts were never reflected in real monies on an account of the defendant or any of the Companies he represents.

111. It is not known how the said document made its way to the trustee's files as Jerzy Mendelka saw on the screen only documents similar to the third document under evidence D, comprising one page, with date in the left top corner, entitled "report date 2012-08-22".

112. Jerzy Mendelka has a few such documents constituting **Evidence Z1 – Z3.** Evidence D from the letter addressed to the trustee does not seem trustworthy. It should be noted that neither the first nor the second document "account transaction" bears any date of issue, and the third document "account snapshot" is a document which Jerzy Mendelka saw on the screen.

113. Comparing the documents, it can be seen that the amounts do not correspond with one another although they relate to the same periods (they are different).

114. This proves the inaccurate creative accounting and they cannot be treated as accounting records, furthermore as they do not exist in any trade ledgers.

### IX Summary

115. Roman Śledziejowski's behaviour also left its clear mark on Jerzy Mendelka, who sought to ask Roman Śledziejowski to return at least some of the funds which had been entrusted with him.

116. For a long time, being nearly sure that he had been swindled, Jerzy Mendelka deluded himself that the extent of the fraud was much less. Śledziejowski claimed that the funds were at the bank of America on so-called Money Market.

117. Roman Śledziejowski made various statements, declarations, he undertook repeatedly to return the funds, but when Jerzy Mendelka demanded that Roman Śledziejowski go with

16

him to Dallas to clarify the issue with PENSON, then Śledziejowski ceased to answer the phone or to reply to e-mails from Jerzy Mendelka.

### X Loans given to Henryk Stark and Adam Mendelka

118. It is also required to provide explanations with regard to the transfers made by Roman Śledziejowski to Henryk Stark and the defendant's son – Adam Mendelka.

119. The transfers are justified, as they constituted the amounts of loans from Jerzy Mendelka to Henryk Stark and Adam Mendelka, while Roman Śledziejowski was only to participate in forwarding funds received in Poland, the equivalent of which he was to transfer from his bank account in the USA.

120. In order to authenticate the transaction, in the presence of Jerzy Mendelka and other witnesses to the conversation, Roman Śledziejowski would call Henryk Stark informing him that he received from Jerzy Mendelka monies for the loan which he was to forward to him in the form of a transfer from his account in New York. Jerzy Mendelka would also confirm by telephone that Roman Śledziejowski had undertaken to transfer to Henryk Stark, from his own account, funds equivalent of the cash received from Jerzy Mendelka. In the same manner, Jerzy Mendelka would lend cash to Adam Mendelka for purchase of cosmetics. Adam Mendelka runes a cosmetics store in Warsaw.

### XI Conclusion

121. Summing up the above reasoning, it should be concluded that the trustee, Ms Marianne T. Otoole, acts as an executor, who is not bound by any law, rules or professional ethics.

122. Searching for the funds embezzled by Roman Śledziejowski, the trustee completely departed from reality and from evidence gathered in the case, and now she wishes to shift the consequences of the fraudulent activities of Roman Śledziejowski to the persons injured by his criminal activities.

123. This leads to a situation where the Trustee, Marianne T. Otoole – overwhelmed by the need to find those guilty of the frauds of Roman Śledziejowski, drafts groundless statements of claim, concealing the truth and fails to disclose evidence important for the settlement. Thus, she places herself above the law, forgetting, however, that attempting to stand in for the adjudicating courts she becomes somehow the defence for Roman Śledziejowski who seeks to shift the guilt to other persons.

17

124. The trustee Marianne T. Otoole forgets that it was Roman Śledziejowski rather than Jerzy Mendelka that sent the funds from Innovest, and if he did so this means he must have the right to do so, therefore from the account to which he was entitled he settled his obligations under the lease contract concluded by TWS with JM Inwest. If the trustee cannot see this relation, this means that the rules of logical reasoning, which are necessary to practice such a prominent profession, are alien to her.

125. Abusing the possibility which law gives her, she leads accidental people, who received transfers from Innovest Holdings, to nervous breakdown, as it was the case with Henryk Stark who was treated like a common criminal, and because of it he suffers from depression.

126. On 23 June 2015, between 4 – 4.30 p.m., Henryk Stark was stalked by telephone by the attorney Joseph S. Maniscalco, whose name is signed under the statement of claim. The attorney proposed Henryk Stark an illegal and secret arrangement. Such a behaviour is at least unethical, but may be also regarded as an offence should it be revealed that there were attempts at inducing Henryk Stark to make false testimonies to the detriment of Jerzy Mendelka.

127. The same refers to Jerzy Mendelka and Adam Mendelka, whose personal interests and good reputation are infringed by the trustee through a wide range of libel and untrue statements.

128. Without going into further analysis of her actions, however, we furnish the reply to the statement of claim, which is necessary in order to present the actual situation.

*I, Marek Kądzielski, the undersigned duly commissioned Sworn Translator of the English language, in Warsaw Poland, do hereby certify the conformity of this true translation version with the original document in Polish presented to me on this 3rd day of July 2015.-----*

*Warsaw, dated 3rd July, 2015.-----*

**Repertorium nr 779/2015.-----**

Pobrano opłatę zgodnie z obowiązującą taksą za trzydzieści cztery (34) strony uwierzytelnione. -----

18